**Slip Op. 01- 36**

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| ─────────────────────────────── | : | |
| | : | |
| ACCIAI SPECIALI TERNI S.P.A. and | : | |
| ACCIAI SPECIALI TERNI (USA), | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Before: WALLACH, Judge |
| v. | : | Consol. Court No.: 99-08-00551 |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant, | : | **PUBLIC VERSION** |
| | : | |
| and | : | |
| | : | |
| ZANESVILLE ARMCO INDEPENDENT | : | |
| ORGANIZATION <u>et al.</u>, | : | |
| | : | |
| Defendant-Intervenors. | : | |
| ─────────────────────────────── | : | |

[Final Determination affirmed in part, remanded in part.]          Decided: March 30, 2001

Hogan & Hartson L.L.P. (Lewis E. Leibowitz, T. Clark Weymouth, Craig A. Lewis, Daniel J. Cannistra, Stephen F. Propfst), Washington, D.C., for Plaintiffs.

Stuart E. Schiffer, Acting Assistant Attorney General; David M. Cohen, Director; Michele D. Lynch, U.S. Department of Justice, Civil Division, Commercial Litigation Branch; Brian K. Peck, Of Counsel, Office of Chief Counsel for Import Administration, Washington, D.C., for Defendant.

Collier Shannon Scott, PLLC (David A. Hartquist, Paul C. Rosenthal, Kathleen W. Cannon, Eric R. McClafferty), Washington, D.C., for Defendant-Intervenors.

# I

## INTRODUCTION

At issue in this case are several aspects of the Department of Commerce, International Trade Administration's ("Commerce" or the "Department") Notice of Final Determination of Sales at Less Than Fair Value: Stainless Steel Sheet and Strip in Coils From Italy, 64 Fed. Reg. 30750 (Dep't Commerce 1999) ("Final Determination"), as amended by 64 Fed. Reg. 40567 (Dep't Commerce 1999) ("Amended Final Determination") in which Commerce found that Plaintiffs, Acciai Speciali Terni S.p.A. and Acciai Speciali Terni USA, Inc. (collectively "AST") were selling their products for less than fair value (i.e. dumping) in the United States.  Plaintiff AST and Defendant-Intervenors Zanesville Armco Independent Organization, et al, through respective Motions For Judgment On The Agency Record, pursuant to USCIT Rule 56.2, challenge the Final Determination.  For the reasons set forth below, the Final Determination is affirmed in part and remanded in part.

# II

## BACKGROUND

AST is a producer and exporter/importer of steel products. See Initiation of Antidumping Duty Investigations: Stainless Steel Sheet and Strip in Coils From France, Germany, Italy, Japan, Mexico, South Korea, Taiwan, and the United Kingdom, 63 Fed. Reg. 37521, 37524 (Dep't Commerce 1998).  A related key player in this investigation is an affiliated reseller identified in Commerce's determinations as reseller 001 ("USR").  See Final Determination at 30750 (referring to reseller 001 as AST's "affiliated U.S. reseller").

On June 30, 1998, Commerce initiated antidumping investigations of imports of stainless steel sheet and strip ("SSSS") in coils from several countries, including Italy. See Initiation of Antidumping Duty Investigations: Stainless Steel Sheet and Strip in Coils From France, Germany, Italy, Japan, Mexico, South Korea, Taiwan, and the United Kingdom, 63 Fed. Reg. 37521 (Dep't Commerce 1998).

On December 17, 1998, Commerce issued its Preliminary Determination. See Notice of Preliminary Determination for Sales at Less Than Fair Value: Stainless Steel Sheet and Strip in Coils From Italy, 64 Fed. Reg. 116 (Dep't Commerce 1999). On June 8, 1999, Commerce issued the Final Determination. The Department amended the Final Determination on July 27, 1999, to correct certain ministerial errors. See Amended Final Determination.

**A**

**Commerce Found the Database Prepared by USR Had
Pervasive Errors, and Applied Adverse Facts Available.**

In the course of the investigation, Commerce "requested AST to provide information for all affiliates involved in the production or sale of the subject merchandise in the foreign market or the United States." Memorandum of the United States in Opposition to the Motion of Acciai Speciali Terni S.p.A. For Judgment upon the Agency Record ("Defendant's Response to Plaintiffs' Motion") at 3 (citing Dep't Commerce Questionnaire at G-6 (Aug. 3, 1998) ("Prepare a single response that includes information, including financial statements, for all affiliates involved with the production or sale of the products under investigation during the period of investigation ('POI') in the foreign market or the

United States market or both. Include the sales and cost of these affiliates with your sales and cost in the same computer data file(s) and submit a single narrative response.")).

In its response AST did not provide complete downstream sales data for its affiliates, stating instead that:

> AST continues to believe that it should not be required to submit any data on downstream sales by resellers that might be deemed to be affiliated companies. Nevertheless, to respond to the Department's request for transaction-specific home market downstream sales data, AST solicited this data from the specific resellers. . . . Unfortunately, . . . AST cannot compel the resellers in which it has only a minority interest to provide the requested data. Though AST asked these resellers to provide this data and offered to assist in the compilation and preparation of the data, the minority-owned resellers declined to cooperate.

Letter from Counsel for AST to Commerce, November 12, 1998, at 3. In reply, Commerce issued a deficiency letter in which it reiterated its request for the downstream sales data by AST's affiliates in the U.S. market. Letter from Commerce to counsel for AST, November 27, 1998 ("[W]e request the following information . . . . the downstream sales of . . . .").

AST did provide downstream sales information for USR. AST submitted a database prepared by USR containing information on further manufacturing and downstream sales. The database was first submitted to Commerce on December 11, 1998, and was then modified and resubmitted to Commerce on January 15, 1999. See Letters from Counsel for AST to Commerce, December 11, 1998 ("enclosed . . . [is] AST's response to the Department's November 27, 1998 request for data on downstream sales and further manufacturing by [USR and other resellers].") and January 15, 1999 ("enclosed . . . [is] AST's response to the Department's January 8, 1999 request for additional

4

information from [USR] . . .This submission also corrects certain minor errors in the data previously submitted . . . .").

At verification,[1] Commerce noted discrepancies between the database submitted to it and the records of USR. It found sales which were not attributed to suppliers, misallocated processing costs, incorrectly applied buffing costs, inaccurately reported quantity surcharges, and inaccurately allocated respinning costs. Final Determination at 30758-60.

In the Final Determination, Commerce held that those discrepancies undermined the entire sales database prepared by USR. It stated that "the frequency of the errors and the absence on the record of information necessary to correct certain of these errors serve to undermine the overall credibility of the further-manufacturing response as a whole, thus compelling the Department to rely upon total facts available for further-manufactured sales by" USR. Id. at 30758.

Commerce identified discrepancies in the program in regard to widths of further-processed coils. It stated that:

> [USR] created a computer program . . . which sought to match an input coil to each output coil sold and to assign a cost for each processing step through which the finished coil supposedly passed. As noted, at verification we tested this computer program to assess its accuracy and reliability and found that seven of eighteen transactions tested contained errors in either the

[1]In the Preliminary Determination, Commerce found that AST and USR were affiliated. Preliminary Determination, 64 Fed. Reg. at 118 ("Based on the evidence, we have preliminarily found that Thyssen AG has the ability to control AST and company A, and therefore, we find that AST and company A are affiliated."). It then requested further information on USR, and issued verification agendas for both cost and sales verifications at USR. See Letters from Commerce to Counsel for AST, February 17, 1999 and February 23, 1999.

allocation of processing costs or in the matching of input coils to output coils. In two of these cases [USR] had assigned processing costs to products which had, in fact, undergone no processing whatever. We note that this discrepancy arose from the input coils and output coils identified by [USR]'s own computer program. In another transaction the combined widths of the finished products were greater than the original width of the input coil as identified by the system, an obvious physical impossibility that should have been identified by [USR] as an error.

Final Determination at 30759.

Commerce also found errors in the reported finishing costs, stating that "[c]ertain coils with a pre-buff finish applied to the underside had no finishing costs reported for the additional processing." Id. Finally, Commerce noted that "other transactions contained errors in the application of surcharges for processing small quantity orders." Id. As to the finishing costs and small quantity surcharges, Commerce stated "both errors reduced the costs allocated to further processed products, thus creating further doubts as to the accuracy of the underlying reporting methodology." Id.

"In this case a partial correction is not a viable option, because of both the high percentage of errors found through our sample testing and the fact that some of the errors cannot be corrected with information on the record. Therefore, pursuant to section 776(a) of the Act, facts otherwise available are applicable to the downstream sales of" USR. Id. at 30760.

Commerce held that "the fundamental and pervasive nature of these errors raises concerns as to the validity not only of the data subjected to direct testing, but of the remainder of the response as well." Id. at 30758. Furthermore:

[t]he computer programming used by [USR] to identify its products' physical characteristics and to match each of these products with its associated costs were found at verification to be accomplishing neither end consistently or accurately. Moreover, both the frequency of the

6

errors and the absence on the record of information necessary to correct certain of these errors serve to undermine the overall credibility of the further-manufacturing response as a whole, thus compelling the Department to rely upon total facts available for further-manufactured sales by [USR].

Id. This rejection having left a gap in the necessary data, Commerce resorted to facts available.

Commerce also determined that AST had not acted to the best of its ability in creating this

database with USR, because:

not only do such fundamental errors as found at verification raise concerns as to the validity of the data not directly tested, but they also demonstrate that the respondent failed to act to the best of its ability to report such information. Indeed, a reasonable check by company officials could have shown that (1) products that underwent no further processing were being assigned further-manufacturing costs, (2) further-processed products were not being assigned further-processing costs, (3) coils passing through certain processes were not being allocated any cost for the process, and (4) the output width of slit coils generated by a given master coil exceeded the original width of that input coil.

Id. at 30760.

Commerce applied adverse facts available to sales unattributed by USR to a specific supplier,

and stated that "it is appropriate to [do so], because these sales were unverifiable. In addition, . . . [a]t

verification, we found that [USR] could have supplied the Department with the supplier names for these

unattributed sales." Id.

**B**

**Commerce Rejected AST's Attempt to Submit Additional Sales
it Discovered Preparing for Verification.**

The U.S. sales database prepared by AST did not include a set of 84 sales. Letter from

Counsel for AST to Commerce, February 24, 1999. AST came forward with a list of these sales ("the

additional sales") on February 24, 1999. Id. The additional sales equaled roughly [   ] of the total U.S.

sales reported.[2]

This submission to Commerce was made after the January 15, 1999, deadline for filing AST's

response to the last supplemental questionnaire on this issue. Letter from Commerce to Counsel for

AST, January 8, 1999 ("The additional information requested in the attachment is due by January 15,

1999, along with the appropriate summarization of proprietary data, as required by 19 CFR 351.904.")

When it requested the information, Commerce informed AST that "[p]ursuant to 19 CFR 302(d), any

information submitted after this date will be untimely filed and will be returned to you." Id. Commerce

rejected this list of sales submitted on February 24, 1999 as an untimely response. Final Determination

at n. 6.

Commerce applied adverse facts available for the unreported U.S. sales, because it found that

"[f]ailure to report significant amounts of import data, such as U.S. sales data, indicates a lack of best

efforts, unless there are extenuating circumstances that explain the failure. There is no evidence of such

circumstances in this case." Id. at 30757.

---

[2]This number includes the additional sales in the calculation.

# C

## Commerce Treated AST's Sales of Side-Cuts and Pup Coils as Prime Merchandise Because it Found AST Had Failed to Support its Claim That They Were Non-Prime.

Commerce's questionnaire regarding AST's U.S. sales database required that the field labeled

PRIMEH contain the following information:

> DESCRIPTION: Indicate whether the merchandise is prime or non-prime (secondary) merchandise. Please note that if subject merchandise meets a specification, it should not be classified as non-prime merchandise *solely* because it does not meet the specification originally intended.
> 1 = Prime
> 2 = Non-Prime Merchandise

> NARRATIVE: If subject merchandise is classified as non-prime, please explain the basis for this classification.

AST's Response to Section B of Commerce's Antidumping Questionnaire ("AST's Section B

Response") (Sept. 28, 1998), at B-2 (emphasis in original).

In the database, AST identified its sales of side-cuts and pup coils as sales of non-prime, or

secondary, merchandise. In its narrative it stated:

> AST tracks sales of non-prime and prime merchandise in the ordinary course of business. Non-prime merchandise is merchandise that cannot be sold as prime material. For example, non-prime merchandise includes products with a surface defect or other physical defect that precludes the merchandise from being used for its intended application. Moreover, non-prime material is sold exclusively from stock and carries no surface finish warranty, thereby further differentiating between prime and non-prime material.

> AST's customers purchase non-prime materials "as is" with respect to surface finish, and a non-prime designation is included in the customer invoice.

AST's Section B Response at B-2 - B-3. (Sept. 28, 1998).

On October 23, 1998, Commerce issued a Supplemental questionnaire in which it requested that "[f]or your U.S. and home market sales listings, please create a separate computer field that identifies the specific reason why each sale was designated non-prime merchandise." Commerce's Supplemental Section B questionnaire (Oct. 23, 1998) at 7.

AST failed to fully respond to the question. It generally described side cuts and pup coils, AST's Supplemental Section B Questionnaire Response at S-17 - S-18, and provided explanations on some of the individual sales, id. at ex. 18 at 50, but did not fully "identif[y] the specific reason why each sale was designated non-prime merchandise."

Commerce issued a Second Supplemental Questionnaire in which the first question stated:

As previously requested in question 6 of the first supplemental questionnaire, please create a computer field that identifies the specific reason why each sale was designated non-prime merchandise. The information reported in response to this question is insufficient to determine which of these sales are sales of non-prime merchandise. Please state, on a transaction specific basis, which side cuts and pup-coils are non-prime and the reason why each is considered non-prime merchandise (*i.e.* defective).

Commerce's Second Supplemental Questionnaire at 1 (Dec. 7, 1998).

AST's response reads:

With regard to side-cuts and pup coils, the classification was intended to convey that all reported sales of side-cuts and pup coils are appropriately treated as non-prime material. Therefore, there is no need to provide a transaction-specific explanation for such classifications.

AST's Response to Second Supplemental Questionnaire at SC3-2 (December 28, 1998) (emphasis in original).

10

In its <u>Final Determination</u> Commerce stated:

> [T]he Department defines non-prime (or secondary merchandise) as "steel which has suffered some defect during the production process, or at any time before delivery to the customer." In its submissions to the Department, AST identified side-cuts and pup coils as secondary merchandise, but did not identify the physical defect or damage associated with each sale of pup coils and side-cuts, as specifically requested by the Department.

<u>Final Determination</u> at 30766 (citations omitted). Commerce therefore "determine[d] that side-cuts and pup coils be considered prime merchandise for the final determination." <u>Id</u>. at 30767.

**D**

**Commerce Disregarded AST's Below Cost Sales, Finding That the
Sales Were Made at Prices That Did Not Allow Recovery of its Costs.**

19 U.S.C. § 1677b(a) provides in part that "[i]n determining under this subtitle whether subject merchandise is being, or is likely to be, sold at less than fair value, a fair comparison shall be made between the export price or constructed export price and normal value."

19 U.S.C. § 1677b(b) then provides in relevant part:

> Whenever the administering authority has reasonable grounds to believe or suspect that sales of the foreign like product under consideration for the determination of normal value have been made at prices which represent less than the cost of production of that product, the administering authority shall determine whether, in fact, such sales were made at less than the cost of production. If that administering authority determines that sales made at less than the cost of production –
>> (A) have been made <u>within an extended period of time in substantial quantities</u>, and
>> (B) <u>were not at prices which permit recovery of all costs within a reasonable period of time</u>,
> such sales may be disregarded in the determination of normal value.

19 U.S.C. § 1677b(b)(1) (1994) (emphasis added).

11

Using the first prong, Commerce found that "[w]here 20 percent or more of a respondent's sales of a given product during the POI were at prices less than the COP, we determined such sales to have been made in 'substantial quantities.'" Final Determination at 30754. This finding is not in dispute.

In order to determine under the second prong if any of the relevant sales were made at prices that provided for recovery of costs within a reasonable time, Commerce applied 19 U.S.C. § 1677b(b)(2)(D), which provides:

> If prices which are below the per unit cost of production at the time of sale are above the weighted average per unit cost of production for the period of investigation or review, such prices shall be considered to provide for recovery of costs within a reasonable period of time.

19 U.S.C. § 1677b(b)(2)(D) (1994).

Commerce found that the statute "is explicit in providing that prices shall be considered to provide for recovery of costs within a reasonable period of time if such prices which are below cost at the time of sale are above the weighted-average per-unit cost of production for the period of investigation." Final Determination at 30772. It "compared prices to weighted-average COPs for the POI" and "determined that such sales were not made at prices which would permit recovery of all costs within a reasonable period of time". Id. at 30754. Therefore, Commerce "disregarded the below-cost sales." Id. at 30755.

12

**E**

**Commerce Applied Adjustments Reported in the REBATE2H Field
as Direct Deductions from Home Market Price.**

In the Final Determination, Commerce applied adjustments reported by AST in the field

REBATE2H in its U.S. sales database as direct deductions from the home market price.  Final

Determination at 30768.  In so doing, it stated:

> We agree with respondents that REBATE2H is more properly considered as price adjustments
> rather than rebates, and that the expenses are appropriately deducted from the home market
> price.  At verification, we reviewed substantial information to conclude that REBATE2H
> consisted of after-sale price adjustments.

Id.

To allow for the lag period that exists between the time a sale is made and the time the price

adjustment is made, AST adjusted the time period reported in the REBATE2H field by two months,

with the period covered in REBATE2H beginning two months after the beginning of the POI, and

ending two months after the close of the POI.  Commerce "determine[d] that AST's methodology for

reporting credit notes . . . is reasonable, as there is no evidence on the record which contradicts AST's

claim regarding a two-month lag period, and there is no reason to believe that respondent's

methodology is in any way distortive."  Id.

13

**F**

**Commerce Added Insurance Revenues as Direct Additions
to AST's U.S. Sales Price.**

In the Final Determination, Commerce added insurance revenue received by AST to its U.S.

sales price. In its November 12, 1998 questionnaire response, AST reported insurance claims on a

transaction-specific basis. Verification Report of AST USA at 2-3; see also Final Determination at

30769. At the beginning of verification, AST submitted to Commerce evidence of an additional

insurance claim not previously reported to Commerce. The revenue from that claim was received

during the POI. This revenue was not reported on a transaction-specific basis, see Memorandum To

File, March 25, 1999, from Lesley Stagliano, Case Analyst, at 2-3, and Commerce "verified [the] fact

that AST was unable to tie this insurance revenue to specific transactions." Final Determination at

30770. Unlike the data relating to the additional sales presented to and rejected by Commerce at

verification, Commerce accepted this new insurance claim information.


In the Final Determination, Commerce "consider[ed] this additional insurance revenue to be

directly applicable to all sales of subject merchandise, because in the absence of these sales, the claim

would not have been made, and the revenue would not have been received." Id. at 30769-70.

Therefore, "[f]or purposes of the final determination, [Commerce] allocated this additional insurance

revenue over all sales of subject merchandise." Id. at 30770.

## III

## STANDARD OF REVIEW

The court has jurisdiction under 28 U.S.C. § 1581(c) (1994).  The court will uphold Commerce's determination in an antidumping investigation unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i) (1994).  Substantial evidence is something more than a "mere scintilla," and must be enough evidence to reasonably support a conclusion.  <u>Primary Steel, Inc. v. United States</u>, 17 CIT 1080, 1085, 834 F. Supp. 1374, 1380 (1993); <u>Ceramica Regiomontana, S.A. v. United States</u>, 10 CIT 399, 405, 636 F. Supp. 961, 966 (1986), <u>aff'd</u>, 810 F.2d 1137 (Fed. Cir. 1987).

## IV

## ANALYSIS

### A

**Substantial Record Evidence Supports Commerce's Decision to
Reject USR's Database and to Apply Total Facts Available
to the Downstream Sales of USR.**

19 U.S.C. § 1677e(a) provides that if a party "withholds information that has been requested by the administering authority" or "provides such information but the information cannot be verified," Commerce "shall . . . use the facts otherwise available in reaching the applicable determination under this title."  19 U.S.C. § 1677e(a) (1994).

Section 1677m(e) provides that:

15

[i]n reaching [its] determination . . . the administering authority . . . shall not decline to consider information that is submitted by an interested party and is necessary to the determination but does not meet all the applicable requirements established by the administering authority . . ., if--

(1) the information is submitted by the deadline established for its submission,
(2) the information can be verified,
(3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination,
(4) the interested party has demonstrated that it acted to the best of its ability in providing the information and meeting the requirements established by the administering authority or the Commission with respect to the information, and
(5) the information can be used without undue difficulties.

Section 1677m also provides, in relevant part, that if a response is deficient, Commerce "shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of investigations or reviews under this title." 19 U.S.C. § 1677m(d) (1994).

As discussed above, Commerce found pervasive errors in USR's data at verification. It found that these errors (unattributed sales and misallocation of processing costs, buffing costs, quantity surcharges and respinning costs) undermined the credibility of the database as a whole.

AST claims that the errors in USR's database should be disregarded. Specifically, it states that "[n]otwithstanding Commerce's assertion that these errors undermined the integrity of USR's data, even taken at their most adverse, the cited errors were confined to the processing portion (PROCESS) – representing [   ]%[3] of U.S. price – of the total reported further manufacturing cost (FURMANU2).

---

[3]Commerce argued at oral argument that this figure of [   ]% is itself unreliable, as it is calculated from data that the Department rejected as inaccurate. Furthermore, it claimed, even if the

16

Finally, as explained below, these purportedly serious errors either were not errors, or were insignificant in the aggregate and/or easily correctable; none of the errors undermines the general integrity of USR's response as a whole." Plaintiffs' Motion for Judgment Upon the Agency Record Under USCIT R. 56.2 ("AST's Motion") at 7 (footnotes and punctuation omitted).

AST also argues that Commerce did not identify any "significant discrepancies or problems in USR's sales data" in its Verification Report, yet "nevertheless asserted that certain isolated errors rendered the entire USR database - including the verified U.S. sales data and other adjustments -- unusable." Id. at 6. It individually attacks the errors found by Commerce.[4]

**1**

**The Errors Identified by Commerce Constitute Substantial Evidence
Supporting the Application of Total Facts Available.**

As to the unattributed sales, AST claims that "USR undertook to comply with Commerce's request [for the source of coil of sold products on a sale-by-sale basis] by creating a computer program that was able to match most, but not all, sales to their source coil." Id. at 7 (footnotes omitted).

---

figure were accurate, it is material, as antidumping investigations are rife with figures smaller than [    ].

[4]In its Reply, AST claims that the information (data on sales through AST's affiliated U.S. reseller) was not perfect, but that at least some of it was usable. See Plaintiffs' Reply Brief at 1 ("AST has never asserted that there were no problems with USR's data, that Commerce was obligated to correct those problems, or that resort to some form of [facts available] was inappropriate.")

17

AST then argues that "[i]n similar situations, including its investigations of other steel service centers, Commerce has not rejected the underlying submissions, but instead has adopted a reasonable allocation methodology for sales of unattributed origin." Id. at 8.

AST cites Certain Cut-to-Length Carbon Steel Plate from Sweden, 60 Fed. Reg. 48502 (Dep't Commerce) (1995) (Prelim. Results) ("Steel Plate from Sweden") as an example to support its statement. In that case, however, Commerce verified that the distributor "could not identify the supplying producer for sales to unrelated customers." Steel Plate from Sweden at 48503 (emphasis added). It also verified that the price of the product was "set without regard to the supplying producer." Id. Commerce verified that the distributor "accurately reported most of its expenses and adjustments," and therefore used its sales listing. Id.

This case is different. Commerce "found that [USR] could have supplied the Department with the supplier names for these unattributed sales." Final Determination at 30760 (emphasis added). It was unable to verify a large portion of the information it sampled from USR's database, and it determined that the database as a whole was unreliable. Id. at 30760-61. Commerce's actions in Steel Plate from Sweden do not contradict its actions here.

AST claims that "[a]ny misallocation of processing costs to products that underwent no further processing was immaterial." AST's Motion at 9. It says "[a]t verification Commerce found only a single sale of unprocessed material that had been allocated processing costs, and that sale did not

18

involve a sale of AST material. . . . [and that] the allocation of minor processing costs to unprocessed material were not biased so as to result in a reduction in the margin." Id. (footnotes omitted) (emphasis in original). Furthermore, it argues that "Commerce bases its U.S. price calculation on average -- rather than transaction-specific -- prices and adjustments, thereby reducing the importance of transaction-specific data in the proceedings. Thus, any overstatement of further processing costs for one sale and understatement for another sale is of little if any consequence". Id. at 9-10 (footnotes omitted). Therefore, AST concludes that "[t]he record does not support Commerce's assertion that 'several of these errors served to understate the costs of further processing by shifting portions of these costs to non-further-processed merchandise.'" Id. at 9 (quoting Final Determination at 30759).

Commerce, however, found errors in seven of the eighteen transactions it sampled at verification. Final Determination at 30759 ("[O]ur testing at verification revealed that costs for three of the nine selected transactions were in error. When the Department then selected nine additional transactions for review, four of these were found to contain errors."). The errors to which Commerce refers were:

> in either the allocation of processing costs or in the matching of input coils to output coils. In two of these cases [USR] had assigned processing costs to products which had, in fact, undergone no processing whatever. We note that this discrepancy arose from the input coils and output coils identified by [USR]'s own computer program. In another transaction the combined widths of the finished products were greater than the original width of the input coil as identified by the system, an obvious physical impossibility that should have been identified by [USR] as an error.

Id.

19

Although AST is correct that the Department "bases its U.S. price calculations on average . . . prices and adjustments", AST's Motion at 9, the average is inaccurate if the numbers averaged are inaccurate. In addition, as Commerce argued at oral argument, AST certified on each of its questionnaire responses that the data submitted was correct, but at verification Commerce found that much of the data was incorrect. The cumulative effect of averaging cannot cure the inaccuracies discovered. Therefore, AST's misallocation of processing costs is material to Commerce's determination and is appropriate for Commerce to consider.

AST argues that errors regarding buffing costs and quantity surcharges could have been corrected by Commerce, and that respinning costs were not separately identifiable, but the total costs were included, so Commerce should not have used errors in reporting them as evidence in its facts available analysis. See AST's Motion at 10-12.

**a**

**Commerce Was Not Obligated to Correct AST's Errors
in its Reported Buffing Costs.**

As to buffing costs, AST argues that "[o]f the [   ] USR reported sales . . . attributed to AST, only [  ] sales -- accounting for only [    ] % by volume -- had a misapplied buffing cost, and each of these sales was identified to, and verified by, the Commerce verifiers. Thus, the few transactions for which the pre-buffing cost was misapplied could be corrected easily." Id. at 10 (footnotes omitted).

The relation of a particular error to any particular volume of sales is here impertinent. Based on the aggregated series of errors found at verification, Commerce concluded that the database was too unreliable to use. Misapplied pre-buffing costs are part of the evidence supporting that conclusion.

In fact, Commerce located at least some[5] of the misapplied pre-buffing allocations at verification. However, Commerce is not necessarily obligated to correct errors. As this court explained in Yamaha Motor Co., Ltd. v. United States:

> It is the respondent's obligation to supply Commerce with accurate information. While Commerce may have had the information to recalculate Yamaha's selling expenses to correct the overstatement, the court has stated that respondents "must submit accurate data" and "cannot expect Commerce, with its limited resources to serve as a surrogate to guarantee the correctness of submissions." In general, Commerce is not required to correct a respondent's errors when erroneous data is reported and not timely corrected.

Yamaha Motor Co., Ltd. v. United States, 19 CIT 1349, 1359, 910 F. Supp 679, 687 (1995) (citations omitted); see also NSK, Ltd. and NSK Corp. v. United States, 17 CIT 590, 825 F. Supp 315 (1993) (when the error is not obvious from the record, Commerce has no duty to correct it or allow for untimely filing of corrected data).

---

[5]AST claims that it submitted a complete list of the errors in Verification Exhibit 18. This exhibit was presented to Commerce on the third day of the three-day verification. Commerce accepted it into the record, but declined to verify the information contained therein, stating that "AST's assertion that [USR] succeeded in identifying all of the errors is unsubstantiated, and could not be verified in the time remaining. The only way to test this eleventh-hour claim would have been to re-verify the entire further-manufacturing database." Final Determination at 30759. Commerce continued "[w]e consider it inappropriate for respondents to expect the Department to retest the entire further manufacturing database on the last day of verification after the Department uncovers numerous errors as a result of its routine testing." Id.

There are circumstances under which Commerce is required to correct or allow correction of clerical errors. In Tehnoimportexport v. United States, 15 CIT 250, 258-59, 766 F. Supp 1169, 1178 (1991), this court held that as to clerical errors, "if the error was so egregious and so obvious that the failure to correct it was an abuse of discretion and undermined the interests of justice, the Court may remand the case to [Commerce] for adjustment of the calculations." See also NTN Bearing Corp. v. United States, 74 F.3d 1204 (Fed. Cir. 1995) (Commerce's refusal to consider correction of clerical errors based upon the correction being an "untimely submission" is an abuse of discretion). However, clerical errors are distinguished from substantive errors, see World Finer Foods, Inc. v. United States, 2000 WL 897752 at *7 (CIT 2000), and result from inaccurate copying or duplication, or other similar unintentional errors, see 19 C.F.R. § 351.224(f) (1999).

Here, AST's inaccurate reporting of data is a substantive error, not a clerical one.[6] The error was in the data reported by AST, not in copying records or recording data. Since the obligation for reporting accurate data falls on AST, and Commerce was not obligated to correct the errors made by AST in reporting its buffing costs, AST's contention that the errors were "easily correctable" and therefore not appropriate evidence of its noncooperation fails.

---

[6]AST has not alleged it to be a clerical error.

**b**

**Commerce Was Not Obligated to Correct AST's Errors
in its Reported Quantity Surcharges.**

AST again argues that Commerce could have corrected AST's own mistakes about quantity surcharges. It admits that "[t]he surcharge for USR's small-volume sales should have been reported as [   ] % of total reported further manufacturing costs, or a price adjustment of [   ] %." AST's Motion at 11 (punctuation omitted). It claims, however, that "Commerce verified the correct amount of the quantity surcharge adjustment that should have been applied, as well as the quantities to which this adjustment should have been applied. As such, USR's

reported further manufacturing cost easily could be adjusted to account for the misapplied quantity surcharges." Id. at 11-12 (footnotes omitted).

As stated above, Commerce is not obligated to correct mistakes made by the respondent except in some circumstances of clerical errors.[7] Yamaha Motor Co., Ltd., 910 F. Supp at 687;

---

[7]Commerce must correct clerical errors that are obvious and egregious. In Tehnoimportexport, 15 CIT at 260, 766 F. Supp at 1178-79, the error at issue was a misreporting of rivet weights in ball bearings. The respondent filed corrected data eleven days prior to the final determination and it was rejected by Commerce. The court stated:

> Clearly, the correction was tendered at the last minute and [Commerce] acted according to its regulations in rejecting it. However, if the error was so egregious and so obvious that the failure to correct it was an abuse of discretion and undermined the interests of justice, the Court may remand the case to [Commerce] for adjustment of the calculations.

Id., 15 CIT at 258-59, 766 F. Supp at 1178 (emphasis added).

The court remanded the final results to Commerce only as to a bearing model where "the rivet was shown to make up more than three times as great a percentage of the total gross weight as the outer ring, which in virtually every other type of bearing forms a much more substantial proportion of the bearing." Id., 15 CIT at 259-60, 766 F. Supp at 1178. The court found this error obvious and egregious, and Commerce's failure to correct the error an abuse of discretion. Id., 15 CIT at 260, 766

23

<u>Tehnoimportexport</u>, 15 CIT 250, 766 F. Supp 1169; <u>NTN Bearing Corp.</u>, 74 F.3d 1204. Therefore, its ability to correct the mistakes does not mean either that it had to do so, nor that the mistakes could not be used as evidence in Commerce's determination that application of total facts available was appropriate. To so hold would be to "shift [the respondent's] burden to Commerce due to [the respondent's] own carelessness." <u>NSK, Ltd.</u>, 17 CIT at 593, 825 F. Supp at 319.


**c**

**Errors in Reported Respinning Costs are Appropriate Evidence
for Commerce to Consider in Making its
Total Facts Available Determination.**

Finally, AST claims that although Commerce requested respinning[8] costs, which are part of processing costs, they could not be separately reported because they are not separately identifiable. AST's Motion at 10. AST argues that "these expenses – which are common to all processed material – were included in the reported total costs." <u>Id</u>.

---

F. Supp at 1179. <u>See also</u> <u>RHP Bearings v. United States</u>, 875 F. Supp 854, 857, 19 CIT 133, 136-37 (1995) (applying <u>Tehnoimportexport</u> and upholding Commerce's determination); <u>NSK Ltd. v. United States</u>, 798 F. Supp 721, 725, 16 CIT 745, 749 (1992) (applying <u>Tehnoimportexport</u>); <u>Societe Nouvelle de Roulements v. United States</u>, 910 F. Supp 689, 694, 19 CIT 1362, 1368 (1995) ("Notwithstanding Commerce's regulatory deadlines, where corrected information has been untimely filed and rejected by Commerce, the court may remand the case to Commerce for recalculation if the error complained of 'was so egregious and so obvious that the failure to correct it was an abuse of discretion and undermined the interests of justice'".).

AST's errors in its reported buffing and quantity surcharge costs were not obvious and egregious, and Commerce's refusal to correct them does not undermine the interests of justice. <u>See</u> <u>Tehnoimportexport</u>, 766 F. Supp at 1178, 17 CIT 259-60 (erroneous rivet weight reported as 63.2% of total gross weight, when other weights reported as between 9% and 22% of total).

[8]"'Respinning' is the process of re-coiling a portion of a coil after a master coil has been cut." AST's Motion at 10 n. 40.

However, whether the final number was included or not, the discrepancy, or as Commerce termed it, the "obvious physical impossibility," of the input coil being narrower than the combined widths of the final products was certainly a legitimate concern for Commerce to raise. The mismatching of the coils called into question the reliability of the processing costs allocation. Since the input and output coils were not properly matched, it was impossible for the costs allocated by AST to the individual coils to be correct. Particularly in light of the numerous other errors found by Commerce at verification, the discrepancies in the reported respinning costs are reasonable evidence for Commerce to rely upon in its finding that the database was unreliable.

The evidence identified by Commerce fulfills the standard of substantial record evidence in support of its rejection of USR's database. It is "enough [evidence] to reasonably support [the] conclusion" that the database was unreliable and unusable. See Primary Steel, 17 CIT at 1085, 834 F. Supp at 1380 (quoting, Ceramica Regiomontana, S.A., 10 CIT at 905, 636 F. Supp at 966).

**2**

**AST's Argument That Commerce Should Have Given it an Opportunity
to Correct or Explain the Errors Fails Because the Pervasive Errors
Were Discovered at Verification.**

AST argues that Commerce should have given it an opportunity to correct or explain the errors found. AST's Motion at 12. It cites to 19 U.S.C. § 1677m(d), which states in relevant part that:

> If the administering authority . . . determines that a response to a request for information under this title does not comply with the request, the administering authority . . . shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent

25

<u>practicable</u>, provide that person with an opportunity to remedy or explain the deficiency <u>in light of the time limits</u> established for the completion of investigations or reviews under this title.

19 U.S.C. § 1677m(d) (emphasis added).

Subsection (e) of the same statute states that:

> In reaching a determination under section . . . 1675 . . . of this title the administering authority and the Commission shall not decline to consider information that is submitted by an interested party and is necessary to the determination but does not meet all the applicable requirements established by the administering authority or the Commission, if–
>
> > (1) the information is submitted by the deadline established for its submission,
> > (2) <u>the information can be verified</u>,
> > (3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination,
> > (4) the interested party has demonstrated that it acted to the best of its ability in providing the information and meeting the requirements established by the administering authority or the Commission with respect to the information, and
> > (5) the information can be used without undue difficulties.

19 U.S.C. § 1677m(e) (1994) (emphasis added).

AST says that "[i]f in fact Commerce believed that these problems rendered the submissions deficient or unusable, it was obligated promptly to inform AST and USR of the nature of the deficiency and to afford AST and USR 'an opportunity to remedy or explain the deficiency in light of the time limits established for completion of investigations . . . .'" AST's Motion at 12. Since Commerce did not issue supplemental questionnaires or specifically mention these problems in the verification agendas, and "it conducted verifications of USR's database", it argues that "Commerce did not perceive these previously disclosed problems as rendering the database inherently unusable." <u>Id</u>.

26

The argument misconstrues the statute. The issue is not whether Commerce found the database inherently unusable, but rather if it was in fact unusable. Commerce found that the pervasive errors rendered it actually unusable, Final Determination at 30759, and it discovered the pervasive nature of the errors at verification. Since Commerce could not have known that the errors rendered the database unusable prior to verification, it was impracticable for it to issue supplemental questionnaires or verification agendas addressing the errors.

Under the statutes previously quoted, Commerce was under no obligation to request corrected submissions from AST after the errors were discovered at verification. AST had a statutory obligation to prepare an accurate and complete record in response to questions plainly asked. See Yamaha Motor Co., Ltd., 910 F. Supp at 687; see also Olympic Adhesives, Inc. v. United States, 899 F.2d 1565, 1571-72 (Fed. Cir. 1990). The database information was clearly requested, and AST failed to provide complete, accurate responses. The errors here were pervasive, and undiscovered before verification, which rendered impracticable correction by AST of its submissions. The "time remaining for completion of the investigation" was 72 days.[9]

---

[9]The Preliminary Determination was issued on January 4, 1999. 64 Fed. Reg. 116. 19 U.S.C. § 1673d(1) (1994) provides that "[w]ithin 75 days after the date of its preliminary determination under section 1673b(b) of this title, the administering authority shall make a final determination". Section 1677d(2) provides that "[t]he administering authority may postpone making the final determination under paragraph (1) until not later than the 135th day after" the preliminary determination. 19 U.S.C. § 1677d(2) (1994). Therefore, the Final Determination had to be issued, at the very latest, by May 19, 1999. (It was actually issued on that date, though it was published in the Federal Register on June 8, 1999.) Verification took place beginning on March 8, 1999. Therefore, Commerce had only 72 days remaining in its statutory period for the investigation, which included allowing for all parties to submit case briefs, a public hearing (which had been requested by both petitioners and respondents, but which request was later withdrawn by both), and preparation and issuance of the Final Determination.

27

Commerce stated its justification for not allowing correction of the data. It said:

The fact remains unchallenged that for two days of a scheduled three-day verification we tested a number of further- manufactured transactions to assess the reliability of [USR]'s methodology for reporting costs and discovered numerous errors. [USR] claimed on the last day of verification that it had reviewed its further-manufacturing data and isolated the magnitude of these errors. AST's assertion that [USR] succeeded in identifying all of the errors is <u>unsubstantiated</u>, and <u>could not be verified</u> in the time remaining. The only way to test this eleventh-hour claim would have been to re-verify the entire further-manufacturing database. . . . We consider it inappropriate for respondents to expect the Department to retest the entire further manufacturing database on the last day of verification after the Department uncovers numerous errors as a result of its routine testing. Furthermore, the requirements of section 782(d) that the Department provide a respondent the opportunity to remedy such errors is inapplicable. Rather, as we stated in *Certain Cut-to-Length Carbon Steel Plate from Sweden*,

> [w]e believe [respondent] SSAB has misconstrued the notice provisions of section 782(d) of the [Tariff] Act. Specifically, we find SSAB's arguments that the Department was required to notify it and provide an opportunity to remedy its verification failure are unsupported. The provisions of section 782(d) apply to instances where "a response to a request for information" does not comply with the request. Thus, after reviewing a questionnaire response, the Department will provide a respondent with notices of deficiencies in that response. However, after the Department's verifiers find that a response cannot be verified, the statute does not require, nor even suggest, that the Department provide the respondent with an opportunity to submit another response.

*Certain Cut-to-Length Carbon Steel Plate from Sweden*, 62 Fed. Reg. 18396, 18401, April 15, 1997.

In this case a partial correction is not a viable option, because of both the high percentage of errors found through our sample testing and the fact that some of the errors cannot be corrected with information on the record.

Final Determination at 30759-60 (emphasis added).

AST "also dispute[s] Commerce's contention that USR's efforts to correct the problems with the cost database 'could not be verified in the time remaining' at verification." AST's Motion at 13 (footnotes omitted). It argues:

28

> In fact, by their conduct the verifiers indicated that these data <u>had</u> been verified.  At the start of the third day of the cost verification USR gave the verifiers a complete description of the programming errors and a list of the problematic transactions.  The verifiers accepted the documentation, reviewed it, asked company officials questions about it, and then incorporated it into the record of this proceeding.  The verifiers then proceeded with and completed the rest of the verification ahead of schedule, in fact changing their travel plans to take an earlier flight home.

<u>Id</u>. (footnotes omitted) (emphasis in original).

Identification of errors and problems does not necessarily produce corrected data.  Rather, it gives rise to an opportunity to correct; an opportunity not taken by AST.  That the verifiers left earlier than planned does not necessarily indicate anything.  Various conclusions can be drawn from an early departure; one is that the data was so useless that there was no point in staying.  The court is in no position to make any inferences.

The terms of 19 U.S.C. § 1677m(e) do not obligate Commerce to permit a remedial response by AST.  All five criteria enumerated in that section must be met before its provisions apply.  <u>See</u> 19 U.S.C. § 1677m(e) (1994).  The information submitted by AST could not be verified.  <u>Final Determination</u> at 30758-59.  Without the need to analyze the other four criteria, the database prepared by USR does not fulfill the criteria of § 1677m(e), and Commerce did not have to give AST and USR an opportunity to submit corrected data after verification.

## 3

**Commerce's Application of Adverse Facts Available Was Proper
Because its Determination That AST Did Not Cooperate
to the Best of its Ability Is Supported by Substantial Record Evidence
and in Accordance with Law.**

In addition to facts available, if Commerce finds that the respondent did not cooperate to the

best of its ability, it can apply an adverse inference. The statute provides:

> If the administering authority . . . finds that an interested party has failed to cooperate by not
> acting to the best of its ability to comply with a request for information from the administering
> authority . . . , the administering authority . . . , in reaching the applicable determination under
> this subtitle, may use an inference that is adverse to the interests of that party in selecting from
> among facts otherwise available.

19 U.S.C. § 1677e(b) (1994). See also Mannesmannrohren-Werke AG v. United States, 77 F.Supp.

2d 1302, 1313 (CIT 1999) ("Mannesmann I") ("Once Commerce determines that use of facts

available is warranted, 19 U.S.C. § 1677e(b) (1994) further permits Commerce to apply an adverse

inference if it makes the additional finding that 'an interested party has failed to cooperate by not acting

to the best of its ability to comply with a request for information.'"); Ferro Union, Inc. v. United States,

44 F.Supp. 2d 1310, 1330 (CIT 1999) (Before applying an adverse inference, Commerce must find

"that a respondent could have complied, and failed to do so.").

Commerce found that the errors it discovered in USR's database showed that AST had not

cooperated fully because it did not respond to the best of its ability. It said:

> [N]ot only do such fundamental errors as found at verification raise concerns as to the validity
> of the data not directly tested, but they also demonstrate that the respondent failed to act to the
> best of its ability to report such information. Indeed, a reasonable check by company officials
> could have shown that (1) products that underwent no further processing were being assigned
> further-processing costs, (2) further-processed products were not being assigned further-

30

processing costs, (3) coils passing through certain processes were not being allocated any cost for the process, and (4) the output width of slit coils generated by a given master coil exceeded the original width of that input coil.

. . . As discussed above, we find that <u>AST, as the respondent, did not cooperate by failing to comply to the best of its ability</u> to provide the CEP information requested by the Department. . . .

With respect to the unattributed downstream sales reported by [USR], we determine, pursuant to section 776(a) of the Act, that it is appropriate to apply facts otherwise available to these sales, because these sales were unverifiable. . . . At verification, <u>we found that [USR] could have supplied the Department with the supplier names for these unattributed sales</u>. . . . Therefore, we determine that pursuant to section 776(b), the use of adverse facts available is appropriate for the entirety of the data submitted by [USR].

<u>Final Determination</u> at 30760 (emphasis added).

Record evidence supports the conclusion that AST did not cooperate to the best of its ability. The errors described by Commerce and reviewed by the court in its determination that application of total facts available was appropriate were widespread. At verification Commerce was able to identify many of the errors using only the information available to AST and USR.

"The first step identified in the Department's verification agenda calls for the respondent, at the outset of verification, to present any errors or corrections found during its preparation for the verification. None of the errors discussed here were presented by [USR] at the outset of verification." <u>Final Determination</u> at 30759. Had AST checked the data submitted, it could have identified errors and corrected them. It did not.

31

AST analogizes this case to Color Picture Tubes from Japan, and argues that "[t]he mere existence of errors or omissions in a party's responses is not evidence of a purposeful failure to cooperate". AST's Motion at 18 (footnotes omitted). In that case, Commerce stated:

> Given the level of cooperation by Mitsubishi, including timely submission of its initial and supplemental questionnaire responses as well as its participation in a verification of its data, the absence of CV data for these sales does not warrant the use of adverse facts available pursuant to section 776(b). On the contrary, for more than 93 percent of its U.S. sales of subject merchandise during the POR [period of review] Mitsubishi provided information such that we are able to calculate an accurate margin. For the relatively few sales for which we had no CV data we exercised our discretion under section 776(a) to determine how to apply facts available to account for the missing data.

Color Picture Tubes From Japan; Final Results of Antidumping Administrative Review, 62 Fed. Reg. 34201, 34209 (Dep't Commerce 1997) (emphasis added).

Color Picture Tubes From Japan is simply not analogous. AST was not particularly cooperative, and the data it submitted was unreliable and unusable. That is not the Color Picture Tubes from Japan situation, where data on 93% of the sales was provided.

The requirement that Commerce find the respondent did not comply "to the best of its ability" at least implies a duty on the respondent to make its response reasonably accurate. Where the relevant information was available to the respondent, its failure to use the information and accurately report the data requested by Commerce is evidence of its failure to meet the standard. Commerce's application of the adverse inference of 19 U.S.C. § 1677e(b) is thus supported by substantial record evidence and in accordance with law.

32

**4**

**Commerce's Choice of Adverse Facts Available Is Remanded as It is**
**Unsupported by Substantial Record Evidence and Not in Accordance with Law**
**Because Commerce Failed to Subtract Expenses from the**
**U.S. Sales Before Applying the Margin.**

Commerce is given wide latitude to select the facts applied. As this court stated in

Mannesmann I, "the ultimate choice of facts available is a matter largely reserved to Commerce's

discretion." Mannesmann I, 77 F.Supp. 2d at 1325 n.13 (citing, Allied-Signal Aerospace Co. v.

United States, 996 F.2d 1185, 1191 (Fed. Cir. 1993) "(recognizing that, as Congress did not explicitly

define what constitutes BIA (now facts otherwise available), Commerce's 'construction of the [BIA]

statute must be accorded considerable deference').").

Commerce's discretion is not unfettered, as discussed in Mannesmannrohren-Werke AG v.

United States, 120 F.Supp. 2d 1075 (CIT 2000) ("Mannesmann II"), where this court states:

> In F. Lli De Cecco, the CIT had held the figure Commerce applied as adverse facts available
> was "thoroughly discredited and uncorroborated." F. Lli De Cecco, 216 F.3d at 1030
> (quotations omitted). The Federal Circuit affirmed, noting that although "it is within
> Commerce's discretion to choose which sources and facts it will rely on to support an adverse
> inference when a respondent has been shown to be uncooperative. . . Commerce's discretion
> in these matters . . . is not unbounded." Id. at 1032." It goes on to say that it is not to choose
> a huge amount that is totally unrelated to the actual amount, but it is to have a certain amount
> added as a deterrent.

Mannesmann II at 1677 n. 4.

Commerce is guided in its choice of adverse facts available by statute. 19 U.S.C. § 1677e(b) (1994) gives a nonexclusive list of sources of the adverse facts that Commerce may apply. It states, in relevant part:

> Such adverse inference may include reliance on information derived from –
> (1) the petition,
> (2) a final determination in the investigation under this subtitle,
> (3) any previous review under section 1675 of this title or determination under section 1675b of this title, or
> (4) any other information placed on the record.

19 U.S.C. § 1677e(b) (1994).

In this case Commerce stated:

> As adverse facts available, we have assigned the highest non-aberrational margin calculated for this final determination to the weighted-average unit value for sales reported by [USR]. To determine the highest non-aberrational margin we examined the frequency distribution of the margins calculated from AST's reported data. We found that roughly 28 percent of AST's transactions fell within a reasonably narrow range of 20 to 29 percent; we selected the highest of these as reflecting the highest non-aberrational margin. Further detail on our selection of the facts-available margin is contained in the *Analysis Memorandum*. We then multiplied the resulting unit margin by the total quantity of resales of subject merchandise by [USR]. This total quantity includes that material affirmatively verified as being of AST origin, as well as a portion of the merchandise of unidentified origin allocated to AST. Since we are relying on verified data for use as adverse facts available for these unattributed sales, corroboration under 776(c) is not necessary.

Final Determination at 30760 (citations omitted) (emphasis added).

AST claims that "the adverse [facts available] that Commerce chose to apply in this case are inconsistent with its legal obligations and past practices in similar situations." AST's Motion at 23. Specifically it argues that Commerce "failed to deduct any of USR's and AST USA's verified

34

expenses," those being "AST USA's further manufacturing costs, movement expenses, circumstance-of-sale adjustments, indirect selling expenses, and packing costs." Id. at 24-25 (footnotes omitted).[10] It argues that Commerce cannot reject verified information in favor of less probative data. In support it cites National Steel Corp. v. United States, 20 CIT 100, 913 F. Supp 593 (1996) ("National Steel II"), in which the court stated that "Commerce's actions may be unreasonable if 'the agency . . . [has] . . . reject[ed] low margin information in favor of high margin information that was demonstrably less probative. . .'" National Steel II at 103, 596 (quoting Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1190 (Fed. Cir. 1990) (alterations in original).

AST also claims that by not adjusting the gross selling price to reflect the deductions, Commerce distorted the intended results of its calculations. AST's Motion at 25. It argues:

> Commerce's use of an unadjusted gross selling price as the basis for calculating the [facts available] margin is inherently distortive and unreasonable. The surrogate percentage margin applied to the USR sales – the highest allegedly "non-aberrant" margin calculated with respect to AST's other U.S. sales – was itself calculated by multiplying the margin of dumping on those sales by the adjusted net U.S. price of the U.S. sales in question. Thus, the surrogate percentage margin that Commerce applied was an adverse measure of USR's dumping margin expressed in terms of net – not gross – U.S. prices. Commerce's subsequent application of this surrogate margin to the average gross price of USR's sales therefore mixed "apples and oranges," distorting the intended results. There is no plausible justification for this approach.

Id.

_____

[10]At oral argument AST claimed that by not subtracting movement and selling expenses from AST's U.S. sales figures before applying the antidumping margin, Commerce's application of a 29% margin effectively imposed a duty of [    ].

35

The Government contends that Commerce did include deductions for movement and selling expenses, because such deductions are part of the calculated margin. Defendant's Response to Plaintiffs' Motion at 17. It cites to the Preliminary Results, in which Commerce stated:

> We calculated CEP, in accordance with subsections 772(b) of the Act . . . We also made deductions for movement expenses in accordance with section 772(c)(2)(A) of the Act; these included, where appropriate, freight equalization charges, foreign inland freight, marine insurance, U.S. customs duties, U.S. inland freight, foreign brokerage and handling, international freight, foreign inland insurance, and U.S. warehousing expenses. In accordance with section 772(d)(1) of the Act, we deducted those selling expenses associated with economic activities occurring in the United States, including direct selling expenses (credit costs, warranty expenses and technical selling expenses), inventory carrying costs, and indirect selling expenses.

Preliminary Results, 64 Fed. Reg. at 121 (emphasis added).

Since "[a] calculated margin already accounts for deductions for movement and selling expenses", the Government argues, "AST's reliance on National Steel II is misplaced." Defendant's Response to Plaintiffs' Motion at 17.

However, AST claims that this argument actually supports its own position. It argues:

> As Defendant now concedes, the [facts available] percentage margin applied to the USR sales was calculated on the basis of, and expressed as, a percentage of U.S. prices that are net of movement and selling expenses. Accordingly, to maintain consistency, this percentage margin should have been applied to a USR price that likewise was net of movement and selling expenses. To apply this percentage – as Commerce did in this case – to a gross price that includes additional movement expenses, selling expenses, and further-manufacturing expenses arbitrarily inflates and distorts the resulting dumping calculation by this difference.

AST's Reply at 11 (emphasis in original).

Commerce calculated a margin from net sales and applied it to gross sales. The apparent inclusion of movement and selling expenses would distort the final calculation. Although "Commerce is in the best position, based on its expert knowledge of the market and the individual respondent, to select adverse facts that will create the proper deterrent to non-cooperation with its investigations and assure a reasonable margin", it may not impose that margin in such a way as to distort the intended result or to result in the imposition of "punitive, aberrational, or uncorroborated margins." F. Lli De Cecco, 216 F.3d at 1032. Since Commerce's application of adverse facts available is unsupported by substantial record evidence, it is not in accordance with law. The Final Determination is remanded to Commerce to apply its adverse facts available margin to U.S. sales net of verified expenses.

**B**

**Commerce's Application of Adverse Facts Available to AST's
Additional U.S. Sales Is Supported by Substantial Record Evidence
and in Accordance with Law.**

Commerce rejected AST's belated attempts to introduce data on 84 U.S. sales that had been omitted from its questionnaire responses. The sales comprised [               ] of the total U.S. sales volume. See Defendant's Response to Plaintiffs' Motion at 21. Having rejected the data as an untimely questionnaire response, Commerce applied facts available. Finding that AST had not cooperated to the best of its ability, Commerce applied an adverse inference. Final Determination at 30757.

37

**1**

## Substantial Record Evidence Supports Commerce's
## Rejection of the Additional Sales.

AST claims that Commerce was not justified in rejecting its additional sales data.  See AST's

Motion at 13-17 ("Commerce's decision to reject the Additional Sales is not supported by substantial

evidence on the record or otherwise in accordance with law.").[11]

However, as the court stated in its earlier opinion on AST's Motion to Expand the

Administrative Record, "The additional sales data was returned to AST as an untimely questionnaire

response."  Acciai Speciali Terni S.p.A. v. United States, 120 F.Supp. 2d 1101, 1102 ("Acciai I")

(citing Final Determination at 30757 n. 6 ("We subsequently rejected other attempts that AST made to

submit this information, pursuant to section 351.302(d) of the Department's regulations, because it was

untimely filed.").).  As earlier noted, "Commerce had no statutory obligation to include rejected

documents in the administrative record, and no similar materials were included in the record." Id. at

1104 (footnote omitted).  The court denied AST's Motion to Expand the Administrative Record,

thereby leaving the gap created by AST's failure to respond fully to Commerce's questionnaires. See

id. at 1108.

As stated above, 19 U.S.C. § 1677e(a) provides that if a party "withholds information that has

been requested by the administering authority" or "provides such information but the information cannot

_____

[11]At oral argument AST conceded that the sales were submitted late, but maintained that the
Department could have accepted the data and verified it without undue prejudice to Commerce, but
that it chose not to do so.

be verified," Commerce "shall . . . use the facts otherwise available in reaching the applicable determination under this subtitle." 19 U.S.C. § 1677e(a) (1994). Since the full listing of U.S. sales lacked these 84 sales, it was appropriate for Commerce to apply facts available to fill the void.

**2**

**Substantial Record Evidence Supports Commerce's Decision to Apply Adverse Facts Available.**

As discussed above, if Commerce finds that the respondent did not cooperate to the best of its ability, it can apply an adverse inference when applying facts available. 19 U.S.C. § 1677e(b) (1994). In regard to the omitted U.S. sales, Commerce stated:

> Failure to report significant amounts of import data, such as U.S. sales data, indicates a lack of best efforts, unless there are extenuating circumstances that explain the failure. There is no evidence of such circumstances in this case. As noted in the Verification Report of AST USA, AST stated at verification that it did not know the reasons why these sales were excluded.

Final Determination at 30757.

Commerce requested the information from AST several times. It stated:

> Although we repeatedly gave AST the opportunity to submit data pertaining to its sales database, AST did not submit its additional U.S. sales until three days prior to the start of verification of AST in Terni, Italy, well after the deadlines for responding to our questionnaires.

Id.

AST offers no citations to record evidence that supports a finding of extenuating circumstances, let alone that would undermine Commerce's finding that none existed, or that indicates that it lacked the ability to provide this information at the proper time in the investigation.

AST argues that "to apply adverse [facts available], Commerce must demonstrate based on record evidence that a respondent's non-cooperation was purposeful; inadvertent errors in a respondent's factual submissions do not justify the application of adverse [facts available]." AST's Motion at 17. AST is incorrect.[12] Commerce does not need to show intentional non-cooperation; it needs only to show that AST did not respond to the best of its ability. 19 U.S.C. § 1677e(b) (1994). See Mannesmann II, 120 F.Supp. 2d at 1083 (the respondent's "alleged good faith does not relieve its burden to respond to the best of its ability."). If Commerce is correct in its finding that AST had the ability to respond completely and failed to do so, it met the statutory requirement. That finding, however, must be supported by substantial record evidence.

_____

[12]AST conceded its error at oral argument, acknowledging that the correct standard is whether the respondent acted to the best of its ability. It maintained, however, that a mistake in the data submitted is not enough to support application of adverse facts available, and cited to Nippon Steel Corp. v. United States, 118 F.Supp. 2d 1366, 1378 (CIT 2000) (stating that in that case, "[t]he only question relevant to the issue of non-cooperation is whether Commerce found [the respondent]'s failure to provide the requested [data] to constitute anything more than an inadvertent error." (internal quotes omitted) (quoting Mannesmann I), and Mannesmann I (stating that "without further explanation by Commerce, the Court will not infer that a respondent's failure to respond constitutes substantial evidence that it failed to cooperate to the best of its ability.").

AST claims that it was not. It cites Notice of Final Determination of Sales at Not Less Than

Fair Value: Stainless Steel Bar from Italy, 59 Fed. Reg. 66921 (Dep't Commerce) (1994) ("Stainless

Steel Bar From Italy") and claims that:

> In Stainless Steel Bar from Italy, the respondent had to compile its U.S. sales listing manually and, in so doing, inadvertently failed to report "a relatively small portion" of its U.S. sales. There, unlike here, Commerce discovered the unreported U.S. sales at verification and, despite the fact that the sales had not been reported prior to verification, verified that the gross unit prices for the unreported sales were comparable to those for reported sales of the same products. In arguing against the application of adverse BIA, the respondent explained that its omission of the unreported sales was unintentional and that Commerce had confirmed that the prices for the unreported sales were comparable to those in reported sales. Based on these considerations, Commerce determined that "it is reasonable to fill this gap with a neutral surrogate" and "assigned {the respondent's} overall weighted-average calculated margin to these unreported sales."

AST's Motion at 22 (footnotes omitted).

AST claims that the present case differs from Stainless Steel Bar from Italy in that "AST

affirmatively attempted to report the Additional Sales both before and at verification and invited

Commerce to verify the information contained in the Additional Sales listing." Id.

AST's reliance on Stainless Steel Bar from Italy is misplaced. As noted by AST, the sales

omitted from the respondent's questionnaire responses in that case accounted for only a

"relatively small portion" of the overall sales.  In this case, AST's additional sales accounted for

[      ] of the total U.S. sales by volume.  See Defendant's Response to Plaintiffs' Motion at 21.  That is

not a small number.

Additionally, in Stainless Steel Bar from Italy, Commerce found that "unique circumstances"

existed that did not warrant an adverse inference.  Stainless Steel Bar from Italy at 66925.  Specifically

it found that "[i]n light of the circumstances surrounding the omission, the limited number of transactions

involved, and the overall accuracy of [the respondent's] response, the Department determines that it is

reasonable to fill this gap with a neutral surrogate."  Id. (citations omitted).  In this case Commerce has

found no special circumstances mitigating AST's failure to respond to the best of its ability.

Finally, even in Stainless Steel Bar from Italy Commerce said "the Department was under no

obligation to accept or review these sales during verification".  Id.  The same holds true here.

It is the respondent's obligation to respond to Commerce's inquiries to the best of its ability;

this means that if it, for some reason, is unable to respond, Commerce may find that it did respond to

the best of its ability despite submitting deficient responses.  Mannesmann II at 1083.  In this case, AST

has made no allegations that it could not provide the additional U.S. sales.  It claims that the omission

was inadvertent; inadvertence is not the same as inability.

42

Substantial record evidence supports Commerce's use of adverse facts available. AST failed to provide the full listing of U.S. sales, despite repeated opportunities. It has cited no record evidence showing that it could not have done so. It has cited to no authority stating that Commerce could not consider its failure to provide the information in a timely manner as evidence of its failure to respond to the best of its ability. Commerce's decision is affirmed.

**3**

**Commerce's Choice of Adverse Facts Available Is Supported
by Substantial Record Evidence.**

As discussed above, Commerce is granted latitude in choosing facts available, see Mannesmann I, 77 F.Supp. 2d at 1325 n. 13; see also 19 U.S.C. § 1677e(b) (1994) (provides nonexclusive list of sources of the adverse facts that Commerce may apply).

As Commerce explained, "As adverse facts available for these unreported U.S. sales, we have applied the highest non-aberrational margin calculated from the rest of the U.S. sales." Final Determination at 30757 (citations omitted).

AST claims that Commerce's choice of adverse facts available is "inconsistent with its legal obligations and past practice in similar situations." AST's Motion at 23. According to AST, "Commerce verified the value of the Additional Sales", but nevertheless "ascribed a sales value" of more than twice the verified value when it applied adverse facts available. Id. at 23-24. This

43

methodology "impermissibly rejects verified record evidence and is not indicative of actual circumstances and rationally related to the Additional Sales", AST argues. Id. at 24.

Commerce exercised its discretion in choosing facts available. If it applied the verified amount of the Additional Sales, as AST would have it do, it would abrogate its rejection of the Additional Sales listing. Instead, it applied information from the record, the highest non-aberrational margin calculated from the rest of the U.S. sales. This is a reasonable choice of facts, which certainly falls within the Department's discretion, and the facts chosen comport with 19 U.S.C. § 1677e(b). The choice of adverse facts available is affirmed.

C

**Substantial Record Evidence Supports Commerce's Treatment of
AST's Claimed Non-Prime Merchandise as Prime, Because AST Failed
to Support Its Claim That the Merchandise
Fit Commerce's Definition of Non-Prime.**

In the Final Determination, Commerce found that "AST's sales of pup coils and side-cuts should be considered sales of prime merchandise." Final Determination at 30766.

Commerce defines "non-prime merchandise" as "'steel which has suffered some defect during the production process, or at any time before delivery to the customer.'" Final Determination at 30766 (quoting Department's Memorandum from Roland L. MacDonald to Joseph A. Spetrini (April 19, 1995)). As Commerce agreed at oral argument, this definition differs from that employed in the industry. However, Commerce was clear in its requests for information in the original and supplemental

44

antidumping questionnaires, and AST conceded at oral argument that it was not confused by

Commerce's questions.[13]

The Department found that "[i]n its submissions to the Department, AST identified side-cuts

and pup coils as secondary [non-prime] merchandise, but did not identify the physical defect or damage

associated with each sale of pup coils and side-cuts, as specifically requested by the Department." Id.

---

[13]Commerce's original questionnaire regarding AST's U.S. sales database required that the field labeled PRIMEH contain the following information:

DESCRIPTION: Indicate whether the merchandise is prime or non-prime (secondary) merchandise. Please note that if subject merchandise meets a specification, it should not be classified as non-prime merchandise *solely* because it does not meet the specification originally intended.
1 = Prime
2 = Non-Prime Merchandise

NARRATIVE: If subject merchandise is classified as non-prime, please explain the basis for this classification.

AST's Section B Response, at B-2 (emphasis in original).

In the Supplemental questionnaire Commerce requested that "[f]or your U.S. and home market sales listings, please create a separate computer field that identifies the specific reason why each sale was designated non-prime merchandise." Commerce's Supplemental Section B questionnaire (Oct. 23, 1998) at 7.

Finally, Commerce's Second Supplemental Questionnaire stated:

As previously requested in question 6 of the first supplemental questionnaire, please create a computer field that identifies the specific reason why each sale was designated non-prime merchandise. The information reported in response to this question is insufficient to determine which of these sales are sales of non-prime merchandise. Please state, on a transaction specific basis, which side cuts and pup-coils are non-prime and the reason why each is considered non-prime merchandise (*i.e.* defective).

Commerce's Second Supplemental Questionnaire at 1 (Dec. 7, 1998).

AST claims that:

Consistent with established industry practice, AST markets and sells certain types of SSSS (and other) products as non-prime merchandise. Such products are sold exclusively from inventory, carry no surface finish warranty, and are sold "as is where is" through a different sales process from sales of prime merchandise. As Commerce verified, each AST invoice indicates whether the sales was of prime or non-prime merchandise.

As required by the questionnaire, AST's sales listings indicated whether each sale was of prime or non-prime merchandise. At Commerce's request in a supplemental questionnaire, AST added a computer field specifying why each non-prime sale was designated as such. In response to another supplemental questionnaire requesting further data on why each sale of side-cuts or pup coils was designated as a sale of non-prime merchandise, AST explained that "all reported sales of side-cuts and pup coils are appropriately treated as non-prime material. Therefore, there is no need to provide a transaction-specific explanation for such classifications."

AST's Motion at 26-27 (footnotes omitted) (emphasis in original).

AST's claim that it need not respond to Commerce's questionnaires as asked is meritless. It relies upon its own and the industry's definition of "non-prime" without regard to the meaning given to it by Commerce. Despite three requests by the Department, AST failed to provide any evidence that its merchandise fit Commerce's definition of "non-prime." AST left the Department with no basis for a finding in its favor. Therefore, Commerce's decision to treat the sales of side-cuts and pup coils as prime merchandise is supported by substantial record evidence.

**D**

**The Cost Recovery Test Employed by Commerce Is in Accordance with Law.**

19 U.S.C. § 1677b(b)(1) provides, in relevant part, that if Commerce:

determines that sales made at less than the cost of production – (A) have been made within an extended period of time in substantial quantities, and (B) were not at prices which permit recovery of all costs within a reasonable period of time, such sales may be disregarded in the determination of normal value.

19 U.S.C. § 1677b(b)(1) (1994).

19 U.S.C. § 1677b(b)(2)(D), titled "Recovery of Costs" states that:

[i]f prices which are below the per unit cost of production at the time of sale are above the weighted average per unit cost of production for the period of investigation or review, such prices shall be considered to provide for recovery of costs within a reasonable period of time.

19 U.S.C. § 1677b(b)(2)(D) (1994).

In the Final Determination, Commerce found that:

[w]here 20 percent or more of a respondent's sales of a given product during the POI were at prices less than the COP, we determined such sales to have been made in "substantial quantities" . . . within an extended period of time. . . . In such cases, because we compared prices to weighted-average COPs for the POI, we also determined that such sales were not made at prices which would permit recovery of all costs within a reasonable period of time, pursuant to [19 U.S.C. § 1677b(b)(2)(D) (1994)]. Therefore, we disregarded the below-cost sales.

Final Determination at 30754-55.

AST claims that "Commerce apparently misreads [§ 1677b(b)(2)(D)] as both defining and absolutely limiting the circumstances under which it may conclude that prices provide for the recovery of costs." AST's Motion at 29. It argues that "Commerce's reasoning is based on an impermissible interpretation of the statute." Id. at 28.

47

The court reviews Commerce's application of the statute according to the two-part test established in Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984).[14] The court first asks "whether Congress has directly spoken to the precise question at issue." Id. at 842. If it has, and if its intent is clear, the court and Commerce must give effect to that unambiguously expressed intent. Id. at 842-43. If it has not, Commerce has the discretion to interpret the statute, and its interpretation will be upheld so long as it is reasonable. Id. at 843.

The statute itself is unclear. It could be read as fully defining the only circumstance under which prices are deemed to allow for recovery of costs. It could also be interpreted as an example of when costs are recovered, but not as limiting such occurrences to those specific circumstances. The court must thus use standard tools of statutory construction, including legislative history, to determine whether Congress's intent is judicially ascertainable. Timex V.I., Inc. v. United States, 157 F.3d 879, 881-82 (Fed. Cir. 1998).

Here, Congress unambiguously expressed its intent in the Statement of Administrative Action, where it stated that § 1677b(b)(2)(D) "specifies when particular prices provide for cost recovery within a reasonable period of time." Statement of Administrative Action of the Uruguay Round Agreements Act, accompanying HR 103-5110 at 832 ("SAA") (emphasis added). The agency must give effect to this clear statement. Chevron, 467 U.S. at 843. Commerce did so when it performed its cost recovery

---

[14]The court notes that the Supreme Court's decision in Christensen v. Harris County, 120 S.Ct. 1655, 2000 U.S. LEXIS 3003 (May 1, 2000), did not affect the court's application of Chevron in this case. Here the court does not reach the issue of deference dealt with in Christensen.

48

test according to § 1677b(b)(2)(D), and stated that the statute "provid[es] for recovery of costs within a reasonable period of time if such prices which are below cost at the time of sale are above the weighted-average per-unit cost of production for the period of investigation." Final Determination at 30772.

Commerce's application of the statute is in accordance with law. Commerce applied Congress's intent stated in the SAA and its cost recovery test is affirmed.

**E**

**Commerce's Application of REBATE2H as a Price Adjustment and Deduction from the Home Market Price Is Supported by Substantial Record Evidence and in Accordance with Law.**

Defendant-Intervenors claim that "REBATE2H should not have been allowed as a direct reduction to the prices of AST's home market sales" because it "did not meet the Courts' or the Department's stated requirements for rebates and other direct price adjustments because the claim (1) relates in part to non-subject merchandise, (2) was not reported on a transaction-specific basis, and (3) was not granted as a fixed percentage of the sales price for all transactions for which is was reported." Zanesville Armco Independent Organizations, et al's Brief in Support of Motion for Judgment Upon the Agency Record Pursuant to Rule 56.2 ("Defendant-Intervenors' Motion") at 7. In making this challenge to the Final Determination, Defendant-Intervenors argue that "[t]he Court should remand this determination to bring the Department's treatment of this rebate in line with its past practice." Id.

49

**Commerce Did Not Change its Policy When it Accepted
Price Adjustments on a Non-Transaction-Specific Basis.**

As Defendant-Intervenors state, "[t]he Court has recognized that 'Commerce has the flexibility

to change its position providing that it explains the basis for its change and providing that the explanation

is in accordance with law and supported by substantial evidence.'" Id. at 8 (quoting Cultivos

Miramonte S.A. v. United States, 980 F. Supp 1268, 1274 (CIT 1997).  However, Defendant-

Intervenors claim that "[i]n this determination, the Department either changed its policy on the treatment

of direct reductions to the prices of sales or misapplied its policy.  The Department did not explain a

basis for a change in policy.  Therefore, the decision is not supported by substantial evidence and is

otherwise not in accordance with law."  Id.

The court finds no evidence that Commerce changed its policy regarding price adjustments.

Commerce articulated its policy in Antifriction Bearings (Other Than Tapered Roller Bearings) and

Parts Thereof From France, Germany, Italy, Japan, Singapore, and the United Kingdom; Final Results

of Antidumping Duty Administrative Reviews, 62 Fed. Reg. 2081 (Dep't Commerce 1997) ("AFB

VI"), where it stated:

> While we prefer that respondents report these adjustments on a transaction-specific basis (or,
> where a single adjustment was granted for a group of sales, as a fixed and constant percentage
> of the value of those sales), we recognize that this is not always feasible, particularly given the
> extremely large volume of transactions involved in these AFBs reviews.  It is inappropriate to
> reject allocations that are not unreasonably distortive in favor of facts otherwise available where
> a fully cooperating respondent is unable to report the information in a more specific manner.
> See section 776 of the Tariff Act[.] . . . Accordingly, we have accepted these adjustments
> when it was not feasible for a respondent to report the adjustment on a more specific basis,

> provided that the allocation method the respondent used does not cause unreasonable
> inaccuracies or distortions.

Id. at 2090 (emphasis added).

The Final Rule promulgated by Commerce on this issue also illustrates a more lenient policy on price adjustments than Defendant-Intervenors would have Commerce apply. See Rules and Regulations, Antidumping Duties; Countervailing Duties ("Final Rule"), 62 Fed. Reg. 27296 (Dep't Commerce) (May 19, 1997). In issuing the Final Rule, Commerce stated:

> The Department of Commerce . . . hereby revises its regulations on antidumping and countervailing duty proceedings to conform the Department's existing regulations to the Uruguay Round Agreements Act, which implemented the results of the Uruguay Round multilateral trade negotiations.

Id. at 27296. The Final Rule states that:

> the Department agrees that allocated expenses or price adjustments may not be as exact as expenses or price adjustments reported on a transaction-specific basis. However, in our view, the drafters of the URAA and the SAA could not have intended that all allocations are inherently distortive or inaccurate for purposes of the AD law.
>
> . . . .
>
> . . . Paragraph (g)(1) [of 19 C.F.R. § 351.401] contains the basic principle that the Department will follow in dealing with allocated expenses and price adjustments, and continues to establish a preference for transaction-specific reporting. . . . [W]e have revised paragraph (g)(1) to provide that the Secretary will consider allocated expenses and price adjustments if the Secretary is satisfied that the allocation method used "does not cause inaccuracies or distortions." As discussed above, because all allocation methods are, in some sense, inexact, the Department intends to reject only those allocations methods that produce unreasonable inaccuracies or distortions.

Id. at 27346 (emphasis added).

Under these clear post-URAA[15] statements of a policy that does not reject non-transaction-specific data out of hand, the court finds that Commerce did not change current policy.

In addition, Commerce's actions are consistent with that policy. Defendant-Intervenors allege that Commerce must apply 19 U.S.C. § 1677m(e) and that it did not do so in this case. Zanesville Armco Independent Organization, et al's Reply Brief ("Defendant-Intervenors' Reply Brief") at 2. The statute reads:

> In reaching a determination under section . . . 1675 . . . of this title the administering authority and the Commission shall not decline to consider information that is submitted by an interested party and is necessary to the determination but does not meet all the applicable requirements established by the administering authority or the Commission, if–
> (1) the information is submitted by the deadline established for its submission,
> (2) the information can be verified,
> (3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination,
> (4) the interested party has demonstrated that it acted to the best of its ability in providing the information and meeting the requirements established by the administering authority or the Commission with respect to the information, and
> (5) the information can be used without undue difficulties.

---

[15]In their brief, Defendant-Intervenors rely upon the pre-URAA case of Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Singapore, Sweden, and the United Kingdom; Final Results of Antidumping Duty Administrative Reviews and Partial Termination of Administrative Reviews, 61 Fed. Reg. 66472, 66498 (Dep't Commerce 1996) ("AFB V") ("we did not accept as direct deductions discounts or rebates unless the actual amount for each individual sale was calculated."). At oral argument, Defendant-Intervenors stated that reliance on pre-URAA law was a mistake, and conceded that the appropriate standard is that contained in 19 C.F.R. § 351.401(g).

19 U.S.C. § 1677m(e) (1994). Since Commerce did not set forth an analysis of those five factors, Defendant-Intervenors claim, its conclusion is not supported by substantial record evidence and in accordance with law.

The Government responded at oral argument that it was unnecessary for the Department to analyze the individual factors, but that it is clear they were met. It stated that the information had to be timely or would have been rejected like the additional U.S. sales were rejected; the information was verified; it was a reliable basis for reaching the determination, as evidenced by the fact that Commerce did actually use it; Commerce verified that AST was unable to report the information on a transaction-specific basis; and clearly the information could be used easily, as it was used. So, despite Commerce not spelling out this analysis, it performed it by evaluating and verifying the information, and then using it.

The information clearly met the standard set forth in 19 U.S.C. § 1677m(e), and Commerce's failure to specify the statute and the factors does not so undermine its conclusion as to render it unsupported by substantial record evidence and not in accordance with law.

**2**

**Defendant-Intervenors' Argument that Inclusion of Data Relating to
Non-Subject Merchandise is Necessarily Distortive Disregards
19 C.F.R. § 351.401(g)(4).**

Defendant-Intervenors argue that by using non-transaction specific data, "AST's averaging methodology does not exclude rebates to customers on non-subject merchandise such as stainless

plate, electrical steel, carbon steel and alloy steel." Defendant-Intervenors' Motion at 10. Defendant-

Intervenors cite to 19 C.F.R. § 351.401(g)(2), which provides that:

> Any party seeking to report an expense or a price adjustment on an allocated basis must demonstrate to the Secretary's satisfaction that the allocation is calculated on as specific a basis as is feasible, and must explain why the allocation methodology used does not cause inaccuracies or distortions.

19 C.F.R. § 351.401(g)(2) (1998).

While Defendant-Intervenors claim that "[t]here is no evidence on the record to indicate that

price adjustments related to nonsubject merchandise can be included without causing a distortion to the

calculation", they do not point to evidence that the calculation is distorted because rebates for non-

subject merchandise are included. See Defendant-Intervenors' Motion at 10.

The argument ignores 19 C.F.R. § 351.401(g)(4), which states that:

> The Secretary will not reject an allocation method solely because the method includes expenses incurred, or price adjustments made, with respect to sales of merchandise that does not constitute subject merchandise or a foreign like product (whichever is applicable).

19 C.F.R. § 351.401(g)(4) (1998).

54

The regulations speak for themselves.[16]  Commerce is prohibited from rejecting the

methodology simply because it included data relating to sales of non-subject merchandise.  It found the

information verifiable and reliable, the methodology reasonable, and found no reason to believe that the

methodology was distortive.  The court has been presented with no evidence to rebut Commerce's

conclusions.

---

[16]At oral argument, Defendant-Intervenors argued that the "not distortive" requirement of §
351.401(g)(2) must be satisfied before § 351.401(g)(4) applies.  Since there is no evidence that
subject merchandise was included, Defendant-Intervenors argue, § 351.401(g)(2) is not satisfied, and
the requirement of 351.401(g)(4) is not relevant.  The regulation reads:

(g) Allocation of expenses and price adjustments.

(1) In general. The Secretary may consider allocated expenses and price adjustments when
transaction-specific reporting is not feasible, provided the Secretary is satisfied that the
allocation method used does not cause inaccuracies or distortions.

(2) Reporting allocated expenses and price adjustments. Any party seeking to report an
expense or a price adjustment on an allocated basis must demonstrate to the Secretary's
satisfaction that the allocation is calculated on as specific a basis as is feasible, and must explain
why the allocation methodology used does not cause inaccuracies or distortions.

(3) Feasibility. In determining the feasibility of transaction-specific reporting or whether an
allocation is calculated on as specific a basis as is feasible, the Secretary will take into account
the records maintained by the party in question in the ordinary course of its business, as well as
such factors as the normal accounting practices in the country and industry in question and the
number of sales made by the party during the period of investigation or review.

(4) Expenses and price adjustments relating to merchandise not subject to the proceeding. The
Secretary will not reject an allocation method solely because the method includes expenses
incurred, or price adjustments made, with respect to sales of merchandise that does not
constitute subject merchandise or a foreign like product (whichever is applicable).

Subsections (2) and (4) are distinct.  The agency has given no indication that subsection (2)
must be satisfied before subsection (4) applies, and Defendant-Intervenors did not cite to contrary
authority.  Their argument therefore fails.

**3**

**Defendant-Intervenors Cite to No Record Evidence to Support
Their Contention That Credit Notes Unrelated to Sales
of Subject Merchandise Were Included as Direct Reductions to Price.**

In their Reply Brief, Defendant-Intervenors argue that "information on the record indicates that AST's allocation of credit notes to sales of SSS&S is distortive, because it resulted in allocation of expenses and adjustments that were unrelated to AST's home market sales of SSS&S during the POI." Defendant-Intervenors' Reply Brief at 6.

Defendant-Intervenors cite Exhibit 16 to AST's Sales Verification Report (Defendant-Intervenors' Exhibit 3 to its Reply Brief), which is titled "Credit Note Coding System." The exhibit is a list of types of credit notes and their respective numerical codes. As stated by Defendant-Intervenors, the list includes "[Credit Note] for VAT Amendments", "[Credit Note] for Italian External Relations", "[Credit Note] Previous Years", and "[Credit Note] for interests of previous year arrears". See Exhibit 16. Defendant-Intervenors state that [e]ven if these types of credit notes were issued to AST's SSS&S customers during the POI, the credit notes were unrelated to sales of SSS&S during the POI, and acceptance of these amounts as a reduction to price for sales during the POI results in an overstatement of the expenses for AST's SSS&S sales during the POI." Defendant-Intervenors Reply Brief at 7. At oral argument Defendant-Intervenors also argued that the credit notes listed as for previous years were clearly related to sales outside the POI.

Defendant-Intervenors fail to cite to record evidence tying credit notes actually issued during the POI and included in Commerce's calculations of REBATE2H to the list of codes present in Exhibit 16. Evidence that AST has codes for many types of credit notes does not constitute substantial record evidence that Commerce included in its calculations credit notes with no relation to sales of subject merchandise during the POI. In fact, record evidence supports Commerce's calculations.

In the Sales Verification Report (exhibit 3 to AST's Second Supplemental Brief), Commerce stated at page 24 that:

> AST explained that it issues four major types of credit notes: technical claims (defective merchandise); price differences; alloy surcharges; and returns. In addition, it has several other types of credit notes, such as for the forgiveness of the VAT (IVA) tax (which a home market customer may request when it buys merchandise with the explicit intent to export), but these are less frequent.
>
> . . . .
>
> . . . AST included in its calculations all credit notes for the period beginning two months after the start of the POI and finishing two months after the POI.
>
> . . . .
>
> AST presented verification exhibit 39, which provides a list of all of the invoices issued to the selected customers during the POI, and all of the credit notes issues pursuant to those invoices. We examined the credit notes to determine the reason for which each was issued. We traced the credit notes to the invoices on the list of invoices.

Commerce clearly verified the rebates, and examined the reasons they were given. Defendant-Intervenors have cited to no record evidence indicating that Commerce erred in its verification of those credit notes or in concluding that they were appropriately treated as direct reductions to AST's home market sales.

57

Commerce's application of the price adjustments as direct reductions to the home market price

is therefore affirmed.


## F

## Commerce's Treatment of AST's Non-Transaction-Specific Insurance Revenue Is Remanded in Part.

Defendant-Intervenors challenge several aspects of Commerce's treatment of the non-

transaction-specific insurance revenue.


## 1

## The Final Determination Is Remanded to Determine Whether Revenue from Pre-POI Shipments Was Included.

Claims on shipments made prior to the POI were included by Commerce in the non-

transaction-specific insurance revenue. Defendant-Intervenors' Motion at 17-20. Defendant-

Intervenors argue that [AST's records reflect that insurance claims made prior to the POI were

included in the figures reported to Commerce.] Id. at 19 (citing Exhibit 1 of the U.S. Sales Verification

Report). Since such pre-POI revenues were included, Defendant-Intervenors argue, "the Department

should have recalculated the amount of this adjustment to exclude claims that occurred for shipments

prior to the POI." Id. at 20 (citations omitted).


The Government agrees that remand on this issue is appropriate. In its brief it states that:

Upon further review, Commerce agrees with [Defendant-Intervenors] that any claims for
damages on shipments that occurred before the POI should not be included in the non-

transaction-specific insurance revenue adjustment to AST's U.S. price. Thus, the case should be remanded to Commerce to review the record to exclude any non-transaction-specific insurance revenue claims that occurred for shipments outside the POI and to recalculate the amount of the non-transaction-specific insurance revenue adjustment accordingly.

Memorandum of the United States in Opposition to the Motion of Zanesville Armco Independent Organization for Judgment Upon the Agency Record ("Government's Response to Defendant-Intervenors' Motion") at 18.

Plaintiffs disagree. AST claims that Defendant-Intervenors' argument "ignores the offsetting effect of using insurance revenue recorded during the POI as the basis for reporting an adjustment." Plaintiffs' Brief in Response to Defendant-Intervenors' Brief in Support of Motion for Judgment on the Agency Record Under USCIT R. 56.2 ("AST's Response to Defendant-Intervenors' Motion") at 9. AST argues that although some reported payments were received during the POI and were for shipments made prior to the POI, insurance revenue received after the POI for shipments made during the POI were not included, and therefore the methodology of including revenue received during the POI, regardless of when the shipment was made, is reasonable. Id. at 9-10.

Remand is appropriate. Commerce stated in the Final Determination that "there is no record evidence to support" the assertion that the additional insurance revenue "relate[d] to sales that occurred prior to the POI." Final Determination at 30770. In fact, there is record evidence to support such an assertion. Commerce must review it and determine its truth or falsity. Commerce must also determine whether the inclusion needs correction, or whether, as AST argues, its methodology of including the

59

insurance revenue actually received during the POI as opposed to revenue resulting from shipments made during the POI is reasonable and non-distortive.

**2**

**The Department's Treatment of Non-Transaction-Specific Insurance Revenue as Direct Additions to U.S. Price Is Not Supported by Substantial Record Evidence or In Accordance with Law.**

Commerce applied the non-transaction-specific insurance revenue as a direct addition to U.S. price. Defendant-Intervenors argue that "[b]ecause there is no basis for the Department's treatment of [this] revenue as a direct addition to U.S. price, the Department's determination on this issue is not supported by substantial evidence and is not in accordance with law." Defendant-Intervenors' Motion at 20. Its argument is based upon the Glossary of Terms provided as an exhibit to the Antidumping Questionnaire. In that Glossary, under the heading "Direct vs. Indirect Expenses", it states that "[d]irect expenses generally must be (1) variable and (2) traceable in a company's financial records to sales of the merchandise under investigation." Glossary of Terms, Defendant-Intervenors' Ex. 11, at I-5. Since "AST failed to tie this insurance revenue to individual sales of subject merchandise", Defendant-Intervenors argue, "[t]here is no evidence . . . linking the insurance revenue to POI sales of subject merchandise." Defendant-Intervenors' Motion at 21 (citations omitted).

Commerce defends its treatment of the additional insurance revenue as being "based upon the same regulations and practice which govern Commerce's acceptance of AST's price adjustment for REBATE2H". Government's Response to Defendant-Intervenors' Motion at 18.

19 C.F.R. § 351.401(g) (1998) sets out Commerce's regulations for the allocation of price adjustments. Subsection (g)(1) states that "[t]he Secretary may consider allocated expenses and price adjustments when transaction-specific reporting is not feasible, provided the Secretary is satisfied that the allocation method used does not cause inaccuracies or distortions." 19 C.F.R. § 351.401(g)(1) (1998).

Commerce verified that "AST was unable to tie this additional insurance revenue to specific transactions." Final Determination at 30770. In the Final Determination Commerce stated that "since this additional claim was received during the POI, and was found to be satisfactory at verification, we determine that it is relevant to use for purposes of calculating total insurance revenue." Id.

However, under Commerce's policy of accepting non-transaction-specific data when it is not unreasonably inaccurate or distortive, see AFB VI, 62 Fed. Reg. 2081, and the Final Rule, 62 Fed. Reg. 27296, and under 19 C.F.R. § 351.401(g), Commerce must actually determine that the data is not inaccurate or distortive. The Final Determination makes no reference to such an analysis. The only reference made in the Final Determination to record evidence is to "an invoice of subject merchandise for which AST received part of this additional insurance revenue", and in which Commerce claims to have found "no discrepancies." Final Determination at 30770. This invoice is not in the record. See Defendant's Response to the Court's Order of January 8, 2001 ("Defendant's First Supplemental Brief") at 1 ("responsible officials of [Commerce] have engaged in an exhaustive review of the evidence in the record, but have found no direct evidence of the specified invoice."). The only record evidence

on the issue is Commerce's statement in the Verification Report that it tied the amount on this invoice "to the amount received on the credit advice from the bank." Verification Report of AST USA at 3 (AST's Motion, Confidential Ex. 16). The Verification Report does not indicate that Commerce actually looked at the invoice in question.[17]

This scant record evidence does not indicate that Commerce considered whether the non-transaction-specific data was inaccurate or distortive. As such, under its own regulations and policy, Commerce's treatment of the non-transaction-specific insurance revenue as direct additions to U.S. price is not supported by substantial record evidence. The Final Determination is remanded for Commerce to make the determination whether the data is inaccurate or distortive.

**3**

**Commerce's Allocations of Non-Transaction-Specific Insurance Revenue Entirely to Subject Merchandise Is Not Supported by Substantial Record Evidence or in Accordance with Law.**

Defendant-Intervenors argue that the Department "overstated the insurance revenue for sales of subject merchandise because it failed to allocate any of the insurance revenue to AST's U.S. sales of non-subject merchandise." Defendant-Intervenors' Motion at 23.

---

[17]The relevant passage in the Verification Report states that "[w]e selected invoice number [      ] from the Accounts Receivable Trial Balance and tied this amount to the amount received on the credit advice from the bank." Verification Report of AST USA at 3 (AST's Motion, Confidential Ex. 16). The Accounts Receivable Trial Balance Report, part of Exhibit 1 to the Verification Report, lists the customer and invoice number, with the relevant dates and amounts, but does not specify the type of merchandise sold on each invoice. So, there is no record evidence that Commerce ever examined the invoice.

The Government argues that 19 C.F.R. § 351.401(g)(4) (1998) controls. That regulation states that "[t]he Secretary will not reject an allocation method solely because the method includes expenses incurred, or price adjustments made, with respect to sales of merchandise that does not constitute subject merchandise or a foreign like product (whichever is applicable)." Id.

It also argues that "Commerce was able to verify and found no discrepancies in an invoice of subject merchandise for which AST received part of the non-transaction-specific insurance revenue. Thus, AST provided, and Commerce verified documentation establishing that AST received at least part of this insurance revenue for subject merchandise." Government's Response to Defendant-Intervenors' Motion at 22 (citations omitted) (emphasis added).

Defendant-Intervenors allege that the invoice Commerce claims to have verified is not in the record, that "neither the accounts receivable trial balance nor any of the credit advices included in the verification exhibits identify the products involved in the insurance claims," and that therefore "no record evidence supports the claim that [Commerce] verified the insurance proceeds related to sales of SSS&S." Defendant-Intervenors' Reply Brief at 14.

They continue that since the Government acknowledges that it only verified that part of the insurance claim revenue came from sales of subject merchandise, that acknowledgment "show[s] that the DOC erred when it allocated all of AST's [non-transaction-specific insurance revenue] solely to AST's sales of SSS&S." Id. at 15 (emphasis in original).

63

While the cited regulation does prevent Commerce from rejecting the methodology of allocating the insurance revenue over all U.S. sales of SSSS, it is not reasonable for Commerce to accept such an allocation if it cannot verify that the revenue includes any revenue from claims made on subject merchandise. As stated earlier, the invoice it claims to have verified is not in the record. See Defendant's First Supplemental Brief at 1. The Government argues that despite this lack of direct evidence, since "Congress has given Commerce wide latitude in formulating its verification procedures", and "not all the documents reviewed in the verification process are made part of the record", "the pertinent inquiry for the Court is whether a reasonable mind might accept the relevant evidence in the record as adequate to support the results of Commerce's verification." Id. at 2 (citations and quotations omitted).

While the Government's argument may be legally correct, it is unable to cite to any record evidence supporting its contention that even part of the non-transaction-specific insurance revenue was for subject merchandise. The Final Determination cites to the Verification Report of AST USA, which states that Commerce "selected invoice number [          ] from the Accounts Receivable Trial Balance and tied this amount to the amount received on the credit advice from the bank. We found no discrepancies." Verification Report of AST USA at 3 (AST's Motion, Confidential Ex. 16). This statement in the Verification Report does not identify whether the invoice was for subject merchandise, and as noted, the invoice itself is not in the record. As noted above, there is no evidence that Commerce even examined the invoice itself, but only that it tied the amount of the invoice listed on the Accounts Receivable Trial Balance to an amount on a credit advice from the bank. Therefore, even

64

under the Government's proposed inquiry, the court finds that the record evidence presented does not support Commerce's conclusion that the non-transaction-specific insurance revenue was in part for subject merchandise.

Therefore, the Final Determination is remanded for Commerce to reconsider its allocation methodology, and either to point to record evidence supporting it, or allocate the revenue according to a different methodology supported by substantial record evidence and in accordance with law.

**4**

**Commerce Included Expenses Incurred on Shipments for
Which AST Received Insurance Revenue.**

Defendant-Intervenors claim that "[i]n examining th[e non-transaction specific] insurance revenue claim, the Department failed to include expenses incurred in connection with the claims." Defendant-Intervenors' Motion at 24. For both the transaction-specific and non-transaction-specific insurance revenue, Defendant-Intervenors argue that "AST's U.S. sales listing includes the revenue that AST received from the sale of its damaged merchandise and includes the total amount of the insurance claim that AST submitted to its insurance company [including reimbursements for shipping and repair costs], but does not include amounts for the expenses that AST incurred". Id. at 26. In other words, Defendant-Intervenors allege that the U.S. sales listing reflects reimbursements for items not reflected in the calculation as ever paid. Defendant-Intervenors claim that the result is an overstatement of AST's U.S. sales, id., and the expenses must be included because "[t]he Department's stated policy is to 'capture both the expenses incurred and revenue earned on the sale at issue'", id. at 24 (quoting

65

NACCO Materials Handling Group v. United States, 21 CIT 799, 801, 971 F. Supp 586, 589 (CIT 1997).

Plaintiffs call this allegation "meritless" because "[i]n reporting its freight expenses in its questionnaire response, AST relied on all of the freight expenses incurred by AST during the POI. Thus, all freight expenses, including freight expenses associated with insurance claims, were included in AST's reported freight expenses adjustment." Plaintiff's Response to Defendant-Intervenors' Motion at 13 (footnotes omitted) (emphasis in original). Defendant agrees. Commerce "added the transaction-specific insurance revenue to AST's U.S. sales' price" and "allocated th[e] additional insurance revenue over all sales of subject merchandise." Final Determination at 30769-70. "Thus," the Government argues, "so long as the insurance revenue reported by AST included the movement expenses related to the insurance claims . . . there was no need for Commerce to separate the movement expenses from the insurance revenue and to make any additional adjustment." Defendant's Response to the Court's Order of January 11, 2001 ("Defendant's Second Supplemental Brief") at 3.

As to the non-transaction-specific claim, Defendant claims that "the detail of expenses are naturally less than those provided for the transaction-specific insurance claims." Defendant's Response to Defendant-Intervenors' Motion at 21. However, Commerce verified an insurance claim that "show[ed] movement expenses were included in the calculation of damages." Defendant's Second Supplemental Brief at 4. Since Commerce was able to verify the examined claim, it "presumed that all other insurance claims included the same expenses." Id. at 2. In its Final Analysis Memorandum,

66

Commerce detailed its calculation of U.S. sales price, and it included movement expenses incurred by AST. See Final Analysis Memorandum, May 19, 1999, at 9-10. Therefore, the Government argues, "[g]iven that AST reported all freight expenses (including freight related to insurance claims) and that compensation for freight expenses for damaged merchandise was included in the insurance revenue, it was unnecessary for Commerce to separate out the freight expenses associated with the insurance claims and to make an additional adjustment." Defendant's Second Supplemental Brief at 4.

Defendant-Intervenors' argument that an overstatement of U.S. sales occurred because the reported insurance revenue included reimbursement of movement and repair expenses is defeated by record evidence showing that no overstatement occurred. Substantial record evidence supports Commerce's addition of the insurance revenue to U.S. price without deducting movement and repair expenses, as these expenses had already been deducted from U.S. sales.

**5**

**The Department Properly Exercised its Discretion in Accepting the
Additional Insurance Revenue Information at Verification.**

Finally, Defendant-Intervenors claim that "[t]he Department should not have accepted AST's new factual information on [the non-transaction-specific] insurance claim because the information was submitted out of time." Defendant-Intervenors' Motion at 27. They argue that "the Department's consistent practice is to reject significant new factual information presented at verification", and that here Commerce "varied from that practice when it accepted AST's new information on insurance revenues during the verification of AST's sales data." Id. (footnotes omitted).

Defendant argues that Defendant-Intervenors have "ignored Commerce's practice of accepting new information at verification in limited circumstances when the information constitutes either a minor adjustment to, or corroborates, clarifies or supports information already on the record." Defendant's Response to Defendant-Intervenors' Motion at 25. In this case, Defendant claims, the adjustment was minor. See id. The effect of accepting the additional insurance revenue is undisputed. It resulted in multiplying the gross unit price of all sales by [    ]. In addition, the information was supplied at the start of verification and supplemented existing record information on insurance claim revenue. Id. at 24; see also Final Determination at 30769-70.

Prior to verification, AST was instructed that "verification is not intended to be an opportunity for submitting new factual information", but that new information may be accepted if it "corroborates, supports, or clarifies information already on the record." Letter from Commerce to AST's Counsel, Feb. 22, 1999, CR 63 at 2. This instruction was consistent with past Commerce practice, Final Affirmative Countervailing Duty Determination: Stainless Steel Sheet and Strip in Coils from France, 64 Fed. Reg. 30774, 30788 (Dep't Commerce 1999) ("The Department has the discretion to accept new information at verification when 'the information makes minor revisions to information already on the record or . . . the information corroborates, supports, or clarifies information already on the record.'"), and with case law, American Alloys, Inc. v. United States, 30 F.3d 1469, 1475 (Fed. Cir. 1994) ("Moreover, the statute gives Commerce wide latitude in its verification procedures. See Hercules, Inc. v. United States, 11 CIT 710, 673 F.Supp. 454, 469 (Ct.Int'l Trade 1987); Kerr-McGee Chem. Corp. v. United States, 14 CIT 344, 739 F.Supp. 613, 628 (Ct.Int'l Trade 1990).").

68

Commerce found that the information on the additional insurance claim made an adjustment to and supported information already on the record. In so doing, it exercised its discretion in accepting the additional data. It was able to verify the information, and therefore use it in its <u>Final Determination</u>. Its acceptance is in accordance with law and supported by substantial evidence, and therefore is affirmed.

V

CONCLUSION

The <u>Final Determination</u> is remanded on the issue of USR's database for Commerce to apply an adverse facts available margin to AST's U.S. sales net of verified expenses; on the issue of non-transaction-specific insurance revenue for Commerce to determine whether it included revenue from shipments made prior to the POI, and whether such inclusion is reasonable under AST's allocation methodology, or whether a different methodology need be employed; for Commerce to consider whether the non-transaction-specific insurance revenue was inaccurate or distortive; and for Commerce

to consider whether its allocation of the non-transaction-specific insurance revenue to all subject merchandise and no non-subject merchandise is appropriate, and to support its conclusions with substantial record evidence.  In all other respects, the Final Determination is affirmed.[18]

_____

Evan J. Wallach, Judge

Date:    March 30, 2001
         New York, New York

---

[18]This opinion is longer, I fear, than the court or the reader might wish.  As Lord Mance said, "I regret any infelicities, I hope minor, and prolixity in this judgment – an instance of Pascal's aphorism 'Je n'ai fait celle-ci plus longue que parce que je n'ai pas eu loisir de la faire plus courte'." Global Container Lines Ltd. v. State Black Sea Shipping Co., 1 Lloyd's Rep. 127, 129 (1999).